892 So.2d 905 (2004)
Melvin SMITH, individually and d/b/a Specialty Motor Cars
v.
AMSOUTH BANK, INC.
1022090.
Supreme Court of Alabama.
May 7, 2004.
*906 Tabor R. Novak, Jr., and W. Evans Brittain of Ball, Ball, Matthews & Novak, P.A., Montgomery, for appellant.
C. Clay Torbert III and Richard H. Allen of Capell & Howard, P.C., Montgomery; and William J. Gamble of Gamble, Gamble & Calame, LLC, Selma, for appellee.
*907 HOUSTON, Justice.
Melvin Smith, individually and d/b/a Specialty Motor Cars ("Smith"), appeals from a summary judgment entered by the Dallas Circuit Court in favor of AmSouth Bank, Inc.
Smith is a wholesale automotive dealer doing business out of his home in Wilsonville. He incorporated "Specialty Motor Cars, Inc." in 1976, but dissolved the corporation in 1980. He never re-incorporated, nor did he register "Specialty Motor Cars" as a tradename with the Alabama Secretary of State. However, Smith resumed his wholesale automotive operation under the name "Specialty Motor Cars." He conducts business solely with automobile dealers, not with the general public.
In December 1998, Smith hired Chuck Utsey to buy and sell vehicles on Smith's behalf. The agreement between Smith and Utsey worked as follows. Utsey was to locate vehicles for Smith to purchase; Smith would then approve the purchase and provide Utsey with the funds to purchase the vehicle from an account at SouthTrust Bank ("Smith's SouthTrust account"). After purchasing the vehicle, Utsey would obtain a bill of sale in the name of "Specialty Motor Cars," take possession of the vehicle, and sell the vehicle once he found a purchaser. Utsey was given the authority to receive, indorse, and deposit checks in Smith's SouthTrust account on behalf of "Specialty Motor Cars."
On September 1, 1999, Utsey, his wife, and his lawyer formed JCU, Inc. ("JCU"). Smith had no knowledge that Utsey had formed that corporation. In early September 1999, Utsey opened a corporate checking account at a Selma branch of AmSouth Bank in the name of "JCU, Inc. d/b/a Specialty Motor Cars." To document the validity of the account, Utsey presented AmSouth with the articles of incorporation of JCU, an occupational license in the joint names of "JCU, Inc." and "Specialty Motor Cars," and the corporate name registration for "JCU, Inc."
AmSouth provides its employees with "The Platform Edge Manual," a guide to various banking functions, including opening new accounts. The manual includes articles of incorporation among the acceptable forms of identification for opening a new account. It lists occupational licenses and corporate name registrations as unacceptable forms of identification for that purpose.
When Utsey opened the corporate checking account, AmSouth completed an "Account Package" form, upon which was printed the following requirement:
"If this account is a corporation or an organization account, it is agreed that the Certified copy of Resolution of the Board of Directors shall be a part of the applicable customer agreement for the account noted below."
Utsey did not have a certified copy of a resolution, yet AmSouth nevertheless opened the account.
After he opened the account at AmSouth, Utsey occasionally deposited checks made out to "Specialty Motor Cars" in his AmSouth account rather than in Smith's SouthTrust account. AmSouth tellers would sometimes give Utsey cash back when he made these deposits. Over time, Smith's debt in his SouthTrust line of credit grew to approximately $266,000, and Smith realized that Utsey had been appropriating Smith's funds to his own use.
On January 22, 2001, Smith sued Utsey, JCU, and AmSouth. Against Utsey and JCU, he alleged that they converted his funds; against AmSouth, Smith made three claims: that AmSouth negligently opened the account, that it negligently accepted checks presented by Utsey, and that it converted Smith's funds. All parties filed answers denying liability. However, *908 Utsey and JCU never responded to any further motions or pleadings. Consequently, the trial court entered a partial summary judgment in favor of Smith with respect to his claims against Utsey and JCU. AmSouth filed a motion for a summary judgment as to Smith's complaint. On August 13, 2003, the trial court entered a summary judgment in favor of AmSouth on all counts. Smith appeals.

Standard of Review
We review a summary judgment de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether there exists any genuine issue of material fact and, if not, whether the movant is entitled to a judgment as a matter of law. Williams, 886 So.2d at 74. In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that he is entitled to a summary judgment, the burden shifts to the nonmovant to produce "substantial evidence" as to the existence of a genuine issue of material fact. Ala.Code 1975, § 12-21-12; Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).

I. AmSouth's Duty of Care
Smith argues that the trial court erred in entering a summary judgment for AmSouth because, he argues, AmSouth negligently failed to follow commercially reasonable industry standards when it opened the corporate checking account for Utsey. Smith's position hinges entirely upon the argument that AmSouth has a common-law duty to the general public to meet a commercially reasonable standard of care in opening bank accounts.[1]
Smith cites as support Patrick v. Union State Bank, 681 So.2d 1364 (Ala.1996), in which we held that a bank has a duty to protect a noncustomer from the criminal acts of a customer of the bank. In Patrick, the plaintiff, Ms. Patrick, noticed that her temporary driver's license (which at that time did not contain a photograph) had been stolen. An impostor used the driver's license to open a checking account at Union State Bank. The impostor provided the bank employee no address because, she said, she lived in a shelter for abused women. She did not sign her complete name, and the signature on the papers required for opening the account differed from Ms. Patrick's signature on her driver's license. The impostor proceeded to deposit $100 in the account; she then wrote roughly $1,500 in checks on the account. Consequently, 11 separate warrants of arrest were issued in Ms. Patrick's name by virtually every city and county in and around Birmingham. Patrick, 681 So.2d at 1366.
Although some jurisdictions dismissed the charges upon an analysis of the handwriting on the checks, Ms. Patrick was arrested and incarcerated by other jurisdictions for a total of 10 consecutive days. All charges against her were eventually dismissed. The impostor was never caught. Ms. Patrick sued the bank. 681 So.2d at 1366. This Court, with Justice Maddox and Justice Houston dissenting and Justice Butts concurring in the result, found that a bank owes "a duty of reasonable care to *909 the person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter." 681 So.2d at 1371.[2]
Smith argues that Patrick imposes a duty of care upon banks making them liable to the public at large and, in this case, to Smith, a noncustomer. Without revisiting Patrick (which we have not been asked to do), we hold that Patrick is distinguishable from the case here and that AmSouth owed no duty to protect Smith from wrongful acts committed by Utsey.
It is axiomatic that to maintain a negligence claim, one must point to the existence of a duty on the part of the defendant. Patrick, 681 So.2d at 1367. Until Patrick, we had held that absent a "special relationship" or "special circumstances," one person owes no duty to protect another from the criminal acts of a third person. Id.
In Patrick, we strayed from this rule, deciding the case on the basis of foreseeability. We purported to reject the "special relationship" test, Patrick, 681 So.2d at 1368, yet, tellingly, we still took the time to find such a relationship. 681 So.2d at 1369 ("there is some relationship between the parties. The fact that the relationship defies common categorization does not mean that there is no relationship."). Clearly, this Court paid homage to the "special relationship" test in Patrick, even if we denied allegiance to it. Therefore, we will examine whether a "special relationship" exists here.
In the action before us, Smith had no relationship with AmSouth Bank, in either his individual or his professional capacity. He had an account with SouthTrust Bank. AmSouth had no reason to know who Smith was or under what name he did business.
In Patrick, we stated that at least the defendant bank "thought that it had a relationship with Ms. Patrick." 681 So.2d at 1369 (emphasis added). That is, when Union State Bank opened the account for the impostor, the bank believed that it was dealing with Bridgette Lashawn Patrick, who was assigned a specific Social Security number and who had specific characteristics, e.g., eye color, hair color, as listed on her temporary driver's license. A description of the impostor was not provided in Patrick, yet even if her characteristics were similar to Patrick's, and even, against all odds, if the impostor's name was "Bridgette Lashawn Patrick," at least one critical distinction would lie in the Social Security number, as to which Union State Bank did not seek verification. Patrick, 681 So.2d at 1365.
In the case before us, AmSouth Bank knew full well with whom it was dealing. It was dealing with JCU, Inc., doing business as Specialty Motor Cars. That is, it was dealing with, JCU, Inc., a corporation formed by Utsey. In opening the account, *910 Utsey presented AmSouth with a form of identification AmSouth considered acceptable  the articles of incorporation of JCU, Inc. As for JCU's tradename, "Specialty Motor Cars," this was as much Utsey's name as it was Smith's. Smith had no exclusive right to the name. For Smith to claim ownership in that tradename, he needed to have followed the procedure set out by § 8-12-1, Ala.Code 1975, which allows "[o]ne who ... conducts a particular business [to] appropriate to his exclusive use, as a trademark, ... any ... name which has not been so appropriated by another to designate the origin or ownership thereof." Because Smith failed to appropriate the name to himself, Utsey was within his rights in doing business under the same name. Regardless, the point is that there is no evidence indicating that AmSouth had, or should have had, knowledge of any of Utsey's wrongful dealings.
Because Utsey, unlike the impostor in Patrick, made no misrepresentations about his identity and made full disclosure to AmSouth, AmSouth could not have thought it was dealing with Smith in any way. Smith makes no argument that he had any "special relationship" with AmSouth. He simply asserts that he is a member of the general public to whom, he asserts, AmSouth owes a duty. Viewing the evidence in a light most favorable to Smith, we nevertheless conclude that he has failed to present substantial evidence indicating that any special relationship existed between him and AmSouth.
The other traditional basis for imposing a duty is the existence of "special circumstances" between two persons. Such circumstances are illustrated where, for instance, a business invitee is "uniquely dependent upon" the owner of premises. Saccuzzo v. Krystal Co., 646 So.2d 595, 597 (Ala.1994) (discussing Young v. Huntsville Hosp., 595 So.2d 1386 (Ala.1992)). Another circumstance we have held sufficiently special to create a potential duty would be where a hotel ignores a guest's desperate plea not to disclose the guest's presence and discloses that guest's presence and location, and that disclosure leads to the murder of the guest. Thetford v. City of Clanton, 605 So.2d 835 (Ala.1992).
In Patrick, we wrote dismissively of the special-circumstances test as being inapplicable in that case. But as we will demonstrate, the test we actually applied in Patrick was identical to our traditional special-circumstances test. Our inquiry in a special-circumstances case is whether the defendant "`knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff.'" Patrick, 681 So.2d at 1372 (Houston, J., dissenting) (quoting Saccuzzo, 646 So.2d at 596); see also Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368, 1371 (Ala.1986); Ortell v. Spencer Cos., 477 So.2d 299, 299 (Ala.1985).
Whether a defendant had such "specialized knowledge" depends upon whether the event causing the harm or injury was foreseeable. Likewise, the test we applied in Patrick was based upon foreseeability. In determining foreseeability, we first emphasize that it is not necessary to anticipate the specific event that occurred, but only that some general harm or consequence would follow. City of Birmingham v. Benson, 631 So.2d 902, 907 (Ala.1993). Additionally, and most importantly to this case, the question of foreseeability is answered by viewing events from the perspective of the defendant charged with negligence, in this case, AmSouth. Hanna v. Riggs, 333 So.2d 563, 567 (Ala.1976).
In Patrick, the resolution of the issue of foreseeability was unclear. We concluded that "[t]he issuance of worthless checks is *911 extremely likely to result from opening a checking account for, and giving checks to, an imposter." 681 So.2d at 1369. Rather than approaching the inquiry from the perspective of the defendant bank, this Court in Patrick appears to have approached the foreseeability inquiry from the perspective of the impostor. Without addressing whether the conclusion in Patrick was appropriate, we note that a properly framed question would ask whether it was foreseeable that the opening of the checking account under the particular circumstances would lead to criminal activity, perhaps the passing of worthless checks. The correct question may have still yielded an affirmative answer, but our inquiry in Patrick was not properly focused.
In this case, we ask a more appropriate and more focused question: whether upon Utsey's tender of JCU's articles of incorporation, as well as an occupational license issued in the joint names of "JCU, Inc." and "Specialty Motor Cars," as forms of identification to open a new account, AmSouth should have foreseen that Utsey would engage in subsequent criminal activity, such as converting the property of another to his own use. Again, Smith has offered no evidence of foreseeability, much less of any special circumstances. Thus, we hold that Smith has failed to present substantial evidence of foreseeability, the focus of both our traditional special-circumstances test and of the test we applied in Patrick.

II. AmSouth's Conduct under the Alabama Commercial Code
Smith next argues that AmSouth violated the Alabama Commercial Code in accepting checks submitted by Utsey for deposit. However, Smith concedes that if Ala.Code 1975, § 7-3-405(b), applies, his recovery would be precluded. Section 7-3-405(b) states that if an employer entrusts his employee with "responsibility with respect to the instrument," a bank accepting the check may be held liable only if it failed to exercise "ordinary care in paying or taking the instrument."
Smith first argues that he had not so entrusted Utsey. The Alabama Commercial Code defines "responsibility" as the authority
"(i) to sign or indorse instruments on behalf of the employer, (ii) to process instruments received by the employer for bookkeeping purposes, for deposit to an account, or for other disposition, (iii) to prepare or process instruments for issue in the name of the employee, (iv) to supply information determining the names or addresses of payees of instruments to be issued in the name of the employer, (v) to control the disposition of instruments to be issued in the name of the employer, or (vi) to act otherwise with respect to instruments in a responsible capacity."
§ 7-3-405(a)(3), Ala.Code 1975.
We note that the language in this definition does not require that some preponderance of these factors be present, but, by the use of "or" as the connector, states that any one of the listed factors will suffice. Smith argues that Utsey had "very limited authority concerning checking account matters." However, the evidence is undisputed that on at least some occasions, Utsey could sign or indorse instruments on Smith's behalf and that Utsey had authority to "process" these instruments "for deposit to an account." He most likely could "act ... with respect to instruments in a responsible capacity." In total, based upon undisputed evidence, we find that Smith entrusted Utsey with sufficient responsibility to place this situation within the purview of § 7-3-405(b), Ala.Code 1975.
Smith next argues that AmSouth "fail[ed] to exercise ordinary care in paying or taking the instrument." § 7-3-405(b), *912 Ala.Code 1975. Section 7-3-103(a)(7) defines "ordinary care" as the "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged."
Smith alleges four defects in AmSouth's procedures in accepting checks Utsey presented for deposit that he believes demonstrate AmSouth's failure to exercise ordinary care. First, Smith argues that at least one deposit slip for the account "JCU, Inc. d/b/a Specialty Motor Cars" simply bore the designation, "JCU, Inc." While this may be true, Smith's citations to the record reveal that the only support for this allegation is his own complaint and a statement deemed by the court to be an admission by Utsey. However, admissions by Utsey are not admissible against AmSouth. As Charles W. Gamble, McElroy's Alabama Evidence § 195.13 (5th ed.1996), states: "The mere fact that two litigants are parties on the same side of the case does not make the admission of one admissible against the other." (Footnote omitted.) Utsey's status as AmSouth's codefendant does not convert his admissions into those of AmSouth. Therefore, there is no evidence that some deposit slips bore only "JCU, Inc."
Smith's second allegation also lacks merit. He alleges that AmSouth violated its cash-back policy by giving Utsey cash when he made some of his commercial deposits. Yet even if these allegations are true, Smith produced no evidence indicating that this practice violates "reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." Ala.Code 1975, § 7-3-103(a)(7). We know only that doing so violated AmSouth's policy, which could be far wider or narrower than "reasonable commercial standards."
Third, Smith offered the testimony of an AmSouth employee indicating that she "personally" would probably not have accepted a check made payable to "Specialty Component Sales."[3] However, this testimony again falls short of evidence sufficient to show that AmSouth violated a standard of commercial reasonableness.
Finally, Smith offered the affidavit of Don Coker, an independent banking consultant who claims to be familiar with banking practices. In his affidavit, Coker states that AmSouth lacked certain necessary policies and that many of the policies it did have in place were simply deficient. However, the only specific allegations Coker makes about AmSouth's policies concern the opening of accounts, not accepting checks into those accounts.
We thus conclude that Smith has failed to produce substantial evidence indicating that AmSouth violated its duty to act in a commercially reasonable manner when it accepted certain checks from Utsey for deposit. Therefore, we find that AmSouth was not negligent. Smith entrusted Utsey with those instruments, and he must bear the corresponding loss.[4]

Conclusion
We find that AmSouth did not owe a duty of care to Smith. The circumstances in Patrick were particularly egregious, and Patrick is distinguishable from this case. Smith had no relationship with AmSouth, and Utsey's actions were not such as to *913 make future criminal action on his part foreseeable. Further, because Smith has failed to demonstrate that AmSouth acted in a commercially unreasonable manner, he has not proved that AmSouth was negligent. Thus, we affirm the trial court's summary judgment.
AFFIRMED.
JOHNSTONE, J., concurs in the rationale in part and concurs in the judgment.
LYONS, BROWN, and WOODALL, JJ., concur in the result.
JOHNSTONE, Justice (concurring in the rationale in part and concurring in the judgment).
But for one exception, I concur in the main opinion. The exception is the treatment of Patrick v. Union State Bank, 681 So.2d 1364 (Ala.1996). My analysis of the distinctions between Patrick and the case now before us is somewhat different from the analysis in the main opinion, and Patrick, in my opinion, is not due the criticism contained in the main opinion. While, in my opinion, the facts, law, and analysis in Patrick fully justify its holdings and judgment, I agree that Patrick is too distinguishable to provide an iota of support for the claims of the plaintiff now before us.
The duty recognized by Patrick is defined in these words:
"[A] bank owes a duty of reasonable care to the person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter."
681 So.2d at 1371 (emphasis added). The ambit of this duty is the protection of the innocent person whose name is printed by the bank on the checks given to the impostor from unjust arrest and incarceration for the crime of writing fraudulent checks. This ambit is necessarily limited to natural persons as distinguished from business entities that cannot be arrested or incarcerated. The rationale of Patrick for this duty and ambit is
"that the fraudulent scheme effectuated here, as well as the injury and harm it caused Ms. Patrick, was foreseeable to the extent that a duty may be imposed. The issuance of worthless checks is extremely likely to result from opening a checking account for, and giving checks to, an imposter: why else would a person open a checking account in another's name when the person has no relationship with the other? Arrest and incarceration of the person in whose name and Social Security number and upon whose identification such an account was opened are probable consequences of the issuance of worthless checks in such a situation. It is foreseeable to banks that failing to follow identification procedures will greatly increase the risk of fraud. It endangers the bank, the bank's customers, and the general public. Thus, as a matter of law, it is foreseeable, in terms of the question of duty, that the person in whose name and Social Security number and upon whose identification a checking account is opened may be injured or harmed by fraud if the bank does not employ commercially reasonable means to verify that the person opening the account and to whom checks are given is not an imposter."
681 So.2d at 1369. The Patrick Court reiterates "that, as a matter of law, the fraudulent acts of the imposter here were foreseeable to the extent that a duty may be imposed on the bank." 681 So.2d at 1371.
The critical features present in Patrick are absent from the case now before us. In the instant case, the account was not opened in the name or upon the identification of the plaintiff himself as a natural *914 person, or indeed of any natural person who could be arrested or incarcerated. Nor does the plaintiff now before us complain that the bank supplied the account opener with checks imprinted with the plaintiff's name, that the account opener wrote fraudulent checks in the plaintiff's name, or that the bank caused any arrest or incarceration of the plaintiff or indeed of any person. The plaintiff's case is simply not the case Ms. Patrick presented in Patrick.
But for the foregoing observations about the Patrick case and its comparison with the case now before us, I concur in the rationale and the judgment of the main opinion. I note that the plaintiff's expert's opinions, as briefed to us, see Rule 28(a)(7) and (10), Ala. R.App. P., seem too conclusionary to constitute substantial evidence.
LYONS, Justice (concurring in the result).
I concur in the result.
The loss Smith complains of arises from Utsey's deposit of checks made payable to "Specialty Motor Cars" in Utsey's account at AmSouth Bank rather than in Smith's account at SouthTrust Bank. As the main opinion points out, Smith did not have an exclusive right to the tradename "Specialty Motor Cars." The main opinion further points out that Smith could have appropriated the tradename to himself by invoking § 8-12-1, Ala.Code 1975, but nothing before us indicates that he has done so. Under these circumstances, as the main opinion further points out, Utsey had just as much right to the use of the tradename "Specialty Motor Cars" as did Smith.
We are not here dealing with an impostor adopting the name of another individual whose exclusive right to use the name, vis-a-vis the impostor, is unquestioned. We had such a case in Patrick v. Union State Bank, 681 So.2d 1364, 1371 (Ala.1996), where this Court held that "a bank owes a duty of reasonable care to the person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter." (Emphasis added.) Because Smith failed to establish his right to the name "Specialty Motor Cars" exclusive of Utsey's right to the same name, Smith cannot avail himself of the rule in Patrick. Neither Smith nor his tradename, in which he had no exclusive rights, is "the person in whose name" the account was opened. Under these circumstances and under the rule established in Patrick, AmSouth owes no duty to Smith. Furthermore, I am unwilling to expand Patrick to embrace the circumstance, such as here, where the person claiming to be the victim of an impostor does not have the exclusive right to use the name. Whether this Court would overrule Patrick if that situation were presented is not before us.
NOTES
[1] It is important to emphasize that Smith's argument as to this issue focuses on common-law negligence, not a violation of the Alabama Commercial Code.
[2] Every court that has examined the issue has answered that banks owe no duty of care to noncustomers. In every case, the courts reasoned that no relationship exists between the defendant financial institution and the plaintiff. See Software Design & Application, Ltd. v. Hoefer & Arnett, Inc., 49 Cal.App.4th 472, 478-83, 56 Cal.Rptr.2d 756, 760-63 (1996); Weil v. First Nat'l Bank of Castle Rock, 983 P.2d 812 (Colo.Ct.App.1999); Anschutz v. Central Nat'l Bank of Columbus, 173 Neb. 60, 69, 112 N.W.2d 545, 550 (1961); Pennsylvania Nat'l Turf Club, Inc. v. Bank of W. Jersey, 158 N.J.Super. 196, 203, 385 A.2d 932, 936 (1978); Gesell v. First Nat'l City Bank of N.Y., 260 N.Y.S.2d 581, 581-82, 24 A.D.2d 424, 425 (1965); Sterner v. Penn, 159 N.C.App. 626, 631, 583 S.E.2d 670, 674 (2003); Volpe v. Fleet Nat'l Bank, 710 A.2d 661, 664 (R.I.1998); Miller-Rogaska, Inc. v. Bank One, Texas, N.A., 931 S.W.2d 655, 663-64 (Tex.App.1996); and Ramsey v. Hancock, 79 P.3d 423, 427 (Utah Ct.App.2003).
[3] Certain of Utsey's customers wrote checks that were payable to other payees, such as "Specialty Component Sales."
[4] We note that Smith does not lack a remedy, rather his partial summary judgment against Utsey is the very definition of that remedy. That Utsey may have disappeared or may be judgment-proof is an unfortunate reality, but not one for which AmSouth must make atonement.